UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

**BENITO SANTIAGO,**

**Plaintiff,**

**v.**                                                    **Case No:  6:12-cv-577-Orl-22DAB**

**GEORGE M. EVANS and BENNYBETH
& JRS EXPRESS,**

**Defendants.**
_____/

## MEMORANDUM DECISION

The present admiralty action places this Court squarely between Scylla and Charybdis. Throughout the present litigation, both the Plaintiff and the Claimants have offered incomplete arguments or lackadaisical filings, riddled with unformatted block quotations, improper citations, and asterisks still included from the direct copying of quotations from Westlaw and Lexis Nexis. However, after holding a one-day trial on November 7, 2012, the Court finds that just as the ill-fated sailor must choose between the two evils,[1] it too must decide which party is the owner of the vessel at issue.

## I.        FACTUAL BACKGROUND

### A.  *The Attorney-Client Relationship Pre-Vessel*

To tell the tale of the vessel Bennybeth & JR's Express ("Vessel"), the Court begins with the attorney client relationship between Plaintiff Benito Santiago ("Santiago") and Claimant George

---

[1] "He runs on Scylla, wishing to avoid Charybdis."   William White, Notes and Queries: A Medium for Intercommunication for Literary Men, General Readers, Etc.   14 (Oxford Press 1887) (in Latin form); *see* Bryan A. Garner, Garner's Modern American Usage 731 (3d ed. 2009).

M. Evans ("Evans") that began in 2007 and eventually shipwrecked sometime in 2011.[2] However, for the Court's purposes, the year 2009 was the year the relationship entered dangerous waters.   Before reaching those waters, additional background is necessary to understand this treacherous tale.

According to Evans, sometime in 1993 or 1994, he and Santiago, a former professional baseball player, began their friendship.  Evans described his relationship with Santiago as one more akin to that between family members, sharing meals and interacting with each other's families.  Eventually, in 2007, Evans, then an attorney, began to represent Santiago in various matters.  However, Evans could only recall having a retainer agreement for a family law case but not for the other matters in which he represented Santiago.  Nevertheless, Evans, by his own account, never sent Santiago invoices for the legal services he rendered.  When questioned why he did not follow this standard practice, Evans testified that Santiago saw the work he was doing but was unable to pay so he did not send Santiago the invoices.  However, to date, Evans still seeks payment for these legal services for which he never sent invoices to his client.

Beyond failing to provide any invoices to his client, Evans loaned substantial sums of money to Santiago for costs directly relating to pending litigation.  For example, according to Evans, he took out a line of credit on his personal account in order to loan money to Santiago so Santiago could pay a bond while appealing an award of attorney's fees in a family court case in which Evans was representing Santiago.  However, Evans never placed the terms of the loan in writing or advised Santiago to seek independent counsel regarding the loan, claiming he loaned Santiago the money as a friend.  Moreover, the check (Defense Ex. No. 6) was for $23,066.67, was drawn

---

[2] Evans testified that he represented Santiago off-and-on from 2007 to 2011 but failed to provide specifics of when the relationship ended and in which matters he represented Santiago, excluding a family law case.

on "The Law Offices of George M. Evans, P.A. Operating Account" and was signed by George Evans.

Evans' uncounseled and term-less loans to Santiago did not end with the bond check.  From March 17, 2009 until August 22, 2009 (while apparently still serving as Santiago's counsel in matters),[3] Evans loaned Santiago a total of $ 48,500.[4]  *See* Def. Ex. Nos. 7-11 (showing various checks from The Law Offices of George M. Evans P.A. Operating Account signed by George Evans to Santiago with "loan" in the memo line).  As well, Evans, on behalf of Santiago, even paid the attorney's fees and costs awarded to the opposition in the family law case in which he was representing Santiago.  *See* Def. Ex. No. 12 (showing a April 17, 2009 check for $61,933.30 from The Law Offices of George M. Evans P.A. Operating Account signed by George Evans to Carlton Fields, P.A. Trust Account with "atty fees + costs Miranda v Santiago" in the memo line).  Again, Evans did not advise Santiago in writing of the terms of the loans nor did he advise Santiago to seek independent counsel.[5]

### B.  *The Alleged Vessel Sale*

Evans claims that on September 10, 2009, he and Santiago entered into a contract under which Evans purchased Santiago's Vessel[6] in exchange for $100,000 and other good and

---

[3] *See, e.g.*, Def. Ex. 13 (showing a July 6, 2009 letter from Evans on his law firm letterhead in which Evans represents to the United States Coast Guard that he and his firm represent Santiago).

[4] Evans testified that he loaned additional sums of money to Santiago but elected not to present evidence of those loans or their amounts at trial.

[5] Eventually, Evans' flouting of the Rules Regulating The Florida Bar ("Rules") caught up to him.  While under investigation for various violations of the Rules, Evans consented to permanent disbarment from The Florida Bar in December 2011.  Pl. Ex. 16.

[6] Santiago originally purchased the Vessel on June 5, 1998 for $950,000.  *See* Pl. Ex. No. 1. Santiago registered the Vessel with the United States Coast Guard on July 9, 1999.  *See* Def. Ex. No. 13.  The last date shown in evidence on which Santiago renewed his United States Coast Guard Certificate of Documentation was July 18, 2002.  *Id.*  As well, there is a July 6, 2009 letter from George Evans to the United States Coast Guard in which Evans represents to the United

valuable consideration.  According to Evans, he and Santiago had discussed as late as June 2009 the sale of the vessel to Evans as a means of setting off the money Santiago allegedly owed Evans for loans and legal services rendered.  Interestingly, during that same timeframe, Evans was representing himself to others as Santiago's counsel.[7]  However, Evans even admits that these negotiations were never in writing and that Evans never advised Santiago to seek independent counsel.

Evans claims that the parties memorialized this agreement in a State of Florida bill of sale ("Bill of Sale"), which identified the Vessel by its certificate of title number and identification number.  Both parties, under the penalties of perjury, allegedly signed the Bill of Sale.  Def. Ex. No. 2.  In the box showing the selling price, the Bill of Sale lists $100,000.  Evans testified that he did not receive $100,000 from Santiago but rather that the $100,000 represented a reduction in the amount Santiago allegedly owed him for previous loans and advanced legal fees in excess of $100,000.[8]  There was no documentation showing this agreement for reducing the debt for the

---

States Coast Guard that he is Santiago's attorney and, on Santiago's behalf, requests the United States Coast Guard to delete the Vessel documentation from the office's DOS system.  *Id.*  According to a form from the United States Coast Guard, the Vessel documentation was deleted on July 10, 2009, prior to the alleged sale of the Vessel to Evans.  *Id.*

[7] Def. Ex. No. 13 (showing a July 6, 2009 letter from Evans to the United States Coast Guard in which Evans represents himself as Santiago's counsel).  Evans claimed that the letter requesting a deletion of Santiago's documentation was necessary in order to record the Bill of Sale between them.  Thus, Evans was clearly still acting as Santiago's counsel at time of the alleged sale agreement between them.

[8] At trial, Evans provided inconsistent testimony that none of the consideration for the Vessel had to do with legal fees.  However, Evans' own exhibits and prior representations to the Court show that he viewed the Vessel as a set off to the legal fees allegedly owed to him.  (*See* Doc. Nos. 83 & 84); *see also* Def. Ex. 17 (showing a May 3, 2012 letter from Evans to Santiago's present counsel Jose D. Sosa in which Evans states, "Mr. Santiago transferred the title to the vessel to me to secure a portion of the monies that he owed to me for loans and legal fees and costs").

Both Evans and Santiago provided inconsistent testimonies during the trial, causing the Court much dilemma in determining who was more credible.

alleged prior loans or advanced legal fees, but Evans did introduce into evidence previous checks with "loan" in the memo line that were payable to Santiago and that Santiago endorsed.[9]

Santiago counters that he never sold or otherwise transferred the Vessel to Evans. As such, Santiago argues that the signature on the Bill of Sale is not his signature. At trial, Evans countered that Santiago did sign the Bill of Sale and that, through an oral agreement, Santiago, prior to Evans selling the Vessel, was able to retain possession of the Vessel so long as Santiago maintained the upkeep for the Vessel, paid for its expenses, and registered the Vessel until it was sold.[10] Both Santiago and Evans had a key to the Vessel.[11]

### C.  *Evans Seeks to Register Title*

Following this mid-to-late summer 2009 activity, there was a two-year lull. On September 21, 2011, Evans wrote to the United States Coast Guard requesting an expedited vessel documentation transfer of Bennybeth & JR's Express to himself. Pl. Ex. No. 19. As a reason for this expedited transfer, Evans wrote, "We have a purchaser who has made a limited-time offer to purchase the vessel." *Id.*[12] After failing to register the Bill of Sale with the United Coast Guard

---

[9] Evans testified that he did not pay sales tax on the purchase of the Vessel because the Florida Department of Revenue allegedly advised him it was unnecessary.

[10] The Court need not resolve whether this oral agreement existed, even if permissible, because the alleged oral agreement is not pertinent to the Court's analysis.

[11] Leading up to this alleged sale between Evans and Santiago in June 2009, Santiago executed a power of attorney granting Evans the power to obtain a duplicate boat title for the Vessel. Pl. Ex. No. 6. Evans testified that this request was necessary to prepare the Vessel for transfer while Santiago testified that it was because he lost the original copy of his title. As well, on July 6, 2009, Evans, representing himself as Santiago's counsel, wrote to the United State Coast Guard to request that the United States Coast Guard delete the vessel documentation from its DOS system. Def. Ex. No. 13.

[12] Interestingly, according to the ultimate purchaser of the Vessel, HH & DD Holdings, LLC ("HH & DD"), its representative Franklin Delano Kelley did not first observe the Vessel until January 2012 and did not make an offer until that time. As well, Kelley, on behalf of HH & DD, testified that HH & DD purchased the vessel with an eye towards reselling it during the summer 2012 boat market. Evans offered no explanation or evidence as to who this mystery purchaser

due to the lack of a notarization, Evans re-filed, on December 13, 2011, the Bill of Sale with a separate undated document signed by his former paralegal Eric Bird.[13]   Def. Ex. No. 3. According to the undated document, Eric Bird affirmed that he was a notary in the State of Florida on September 10, 2009 and that he witnessed and attested as a notary to the signatures of Santiago and Evans on the Bill of Sale.  *Id.*  Despite there being no proof of notarization other than this undated document from Eric Bird, the United Coast Guard issued a Certificate of Documentation to George Evans on January 18, 2012.[14]  Def. Ex. No. 5

D. *The Sale to HH & DD Holdings, LLC*

On March 20, 2012, Evans and HH & DD Holdings, LLC ("HH & DD") entered into an agreement for the sale of the Vessel.  Def. Ex. No. 1.  Evans testified that he sold the Vessel to HH & DD for $110,000.  Claiming that the ultimate goal always was to sell the Vessel, Evans now allegedly credited $110,000, rather than only $100,000, towards Santiago's alleged debt owed to him.  According to Franklin Delano Kelley (a member of HH &DD), before purchasing the vessel, HH & DD, in order to verify the ownership of the Vessel, checked the abstract of title with the United States Coast Guard but did not check if there was a Florida title.  Kelley testified that his search revealed Evans as the owner of the Vessel.[15] As well, according to Kelley, Santiago was present during the transfer of ownership to HH & DD.

## II.    PROCEDURAL BACKGROUND

was in September 2011 as the evidence shows HH & DD was not even casting a line of interest until January 2012.
[13] Eric Bird did not testify at trial although the Claimants listed him as a possible witness.  (Doc. No. 84).
[14] Interestingly, on May 11, 2011, the State of Florida issued a Florida Vessel Registration to Santiago for the same vessel.  Pl. Ex. No. 3.  The registration expired on March 9, 2012.  *Id.*
[15] The Court notes that the same counsel represented Evans and HH & DD at trial.

6

On April 16, 2012, Santiago initially filed the present action, invoking this Court's admiralty and maritime jurisdiction.  Santiago sought to secure the possession of the Vessel and claimed that no sale between he and Evans existed.[16]

The Claimants Evans and HH & DD argued that the Court lacked subject matter jurisdiction over this case because Santiago allegedly sold Evans the Vessel.  The Claimants sought a dismissal of the case.  The Court denied the motion to dismiss based on *Bell v. Hood*, 327 U.S. 678 (1945) and its progeny.  (*See* Doc. No. 60).

### III.    A CONTRACT FOR SALE: LEGAL STANDARD AND ANALYSIS

A vessel is a "good" for purposes of Florida's Uniform Commercial Code ("UCC") and a determination of legal title will necessarily depend upon whether or not there was a sale to Evans.  *See Jones v. One Fifty Foot Gulfstar Motor Sailing Yacht, Hull No. 01*, 625 F.2d 44, 47 (5th Cir. 1980); *see also id.* at 47 n.4 ("If the law of admiralty in a petitory action did not require a determination of legal title, resolution of this case would be quite simple.").[17]  Therefore, the alleged Bill of Sale is subject to the Statute of Frauds set out in Section 672.201 of the *Florida Statutes* because the alleged sale of the Vessel was for a price of $100,000.

---

[16] Although not clear from the Complaint, it appears Santiago is bringing a petitory action and possessory action.  A petitory action is a suit "to try the title to a ship independently of any possession of the vessel." 1 Benedict on Admiralty § 201, § 201 n. 2 (7th Rev. Ed. 2011) (noting that a petitory suit requires plaintiff to assert a legal title to the vessel because equitable title is insufficient); *see also Wehr v. Pheley*, No. C 99-4574 SI, 2000 WL 236438, at *3 (N.D. Cal. Feb. 16, 2000) ("A 'possessory action' is one in which a party who claims to be entitled to possession of a vessel and to have been wrongfully dispossessed seeks to recover that vessel.  A petitory suit is utilized to assert legal title to a vessel, or to remove a cloud upon one's title, and is analogous to a suit to quiet title but with a specific adversary in mind, rather than to perfect a title against everyone in the world." (citations omitted)).  In contrast, a possessory action is one "to recover vessels or other property to which an owner, seamen or lienor is of right entitled."  *Id.* at § 201.  In the present case, Santiago requests the Court to name him the "rightfully titled owner of the vessel." (Doc. No. 42 at p. 3).

[17] *See Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc) (adopting as binding precedent all decisions of the former Fifth Circuit prior to the close of business on September 20, 1981).

Section 672.201 provides that a contract for the sale of goods for the price of $500 or more is not enforceable unless there is a writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought. The Bill of Sale satisfies these requirements.

The Court finds the Bill of Sale evidences an offer by Evans to purchase the Vessel for $100,000. Evans clarified at trial that Santiago did not pay him $100,000 at the time of the sale but rather that Evans reduced the amount of the debt Santiago allegedly owed him for previous loans and advanced legal fees. Without refuting the debt, Santiago argues that the face of the Bill of Sale does not evidence that the consideration was a reduction in Santiago's debt. Further, Evans confirmed that the parties never executed a specific writing that explained that the $100,000 in consideration was in actuality a reduction in the debt Santiago allegedly owed Evans. Nonetheless, the Court finds that Evans produced sufficient, non-rebutted evidence that Evans loaned Santiago funds and advanced Santiago legal fees for at least $100,000. *See, e.g.*, Def. Ex. Nos. 6-12 (showing checks Evans drafted to Santiago or checks Evans drafted for Santiago's benefit).

The final issue is Santiago's disputed signature. Santiago testified that he did not sign the Bill of Sale. The Court did not find Santiago's testimony on this point credible. To rebut Santiago's contention, Claimants presented the testimony of Thomas Vastrick ("Vastrick"), a forensic document examiner.[18] Vastrick, certified by the American Board of Forensic Document Examiners, compared a copy of the bill of sale with copies of five checks Santiago endorsed from Evans, a copy of a 2009 power of attorney signed by Santiago, a copy of a 2004 yacht brokerage center listing agreement signed by Santiago, copies of a 2012 sworn statement and

---

[18] At trial, the Court qualified Thomas Vastrick as an expert in forensic document examination.

response to the Court's Show Cause Order signed by Santiago, and a copy of a 2008 disclosure statement signed by Santiago.

Following the ASTME-2290 examination methodology, Vastrick conducted a side-by-side comparison of the aforementioned documents and found to a high degree of probability that the signature on the Bill of Sale and the signatures on the documents were written by the same person. Explaining the term "high probability," Vastrick testified that "high probability" means the examiner is virtually certain that the questioned writing and the known writings are from common origin with a minor limiting factor (i.e., the lack of an original writing for comparison).

Vastrick testified that when he asked for an original copy of the Bill of Sale, he was informed that it did not exist or was not available. He explained that the lack of the original Bill of Sale did not seriously limit the examination even though he was unable to do a microscopic examination of pen pressure. *See Wolf v. Ramsey*, 253 F. Supp. 2d 1323, 1346 (N.D. Ga. 2003) (concluding that a forensic document expert's reliance on copies rather than originals goes to the weight of the expert's testimony rather than the admissibility of the testimony). Moreover, Vastrick testified that Santiago's signature is a complex one, making it more difficult to forge. Thus, the Court concludes that Santiago signed the Bill of Sale that Evans seeks to enforce against him.

### IV.   WHETHER THE CONTRACT IS VOID: LEGAL STANDARD AND ANALYSIS

A conflicted attorney who is incapable of recognizing a conflict dooms himself to consequences that will reverberate through time. In the present case, Evans, now a permanently disbarred attorney, showed an utter disregard for the most basic rules included in the Rules Regulating The Florida Bar—ones that are taught the first day in a law school's professional responsibility class.

First, Evans violated Rule 4-1.7(a) of the Rules Regulating The Florida Bar because during his representation of Santiago, there was a substantial risk that his representation would be materially limited by his own personal interests.[19]   As explained above, while representing Santiago, Evans loaned Santiago significant sums of money, advanced legal fees, and entered into the agreement for the sale of the Vessel from Santiago.   Despite these adverse financial interests, Evans testified that he never advised Santiago in writing of the terms of these loans and advanced legal fees nor did he advise Santiago to seek independent counsel.   This rule exists to prevent the dispute that is before the Court today as the Comment to Rule 4-1.7 explicates,

> The lawyer's own interests should not be permitted to have adverse effect on representation of a client. . . . If the probity of a lawyer's own conduct in a transaction is in serious question, it may be difficult or impossible for the lawyer to give a client detached advice.

In the present case, the mounting debt Santiago allegedly owed Evans clearly compromised Evans' ability to provide detached advice to Santiago regarding the sale of the Vessel.

---

[19] Rule 4-1.7(a) of the Rules Regulating The Florida Bar states:

> **Representing Adverse Interests.**   Except as provided in subdivision (b), a lawyer shall not represent a client if:
> > (1) the representation of 1 client will be directly adverse to another client; or
> > (2) there is a substantial risk that the representation of 1 or more clients will be materially limited by the lawyer's responsibilities to another client, a former client or a third person or by a personal interest of the lawyer.

R. 4-1.7(a) of R. Regulating Fla. Bar.

Second, Evans violated Rule 4-1.8(e) by providing financial assistance to a client in connection with a pending litigation, the family law case.[20] As set forth above, Evans testified and presented evidence that he advanced legal fees for Santiago (while never sending an invoice to Santiago) and paid a bond and attorney's fees in an ongoing family law case for Santiago. *See, e.g.*, Def. Ex. Nos. 6 & 12 (showing checks from The Law Offices of George M. Evans, P.A. Operating Account signed by Evans to the Clerk of Court with the memo line "Bond Appeal Santiago" and to Carlton Fields, P.A. Trust Account with the memo line "atty fees + costs Miranda v Santiago"). Evans even testified that he used a personal line of credit to advance such funds for Santiago's benefit. As a defense, Evans claimed he provided these funds to Santiago as a friend and not as an attorney. The Court does not find Evans credible on this point[21] because, again, Evans did not advise Santiago in writing[22] of the terms of these loans and

---

[20] Rule 4-1.8(e) of the Rules Regulating The Florida Bar states:

> **Financial Assistance to Client.** A lawyer shall not provide financial assistance to a client in connection with pending or contemplated litigation, except that:
> > (1) a lawyer may advance court costs and expenses of litigation, the repayment of which may be contingent on the outcome of the matter; and
> > (2) a lawyer representing an indigent client may pay court costs and expenses of litigation on behalf of the client
> > .

R. 4-1.8 of R. Regulating Fla. Bar.

[21] Although the Court accepts the testimony of Evans that a contract for the sale of the Vessel existed, it finds that often Evans and Santiago both provided incredible testimony throughout the trial. They were like Sirens attempting to steer the Court off course.

[22] It is unclear if Evans even advised Santiago orally about any terms associated with these loans and advanced legal fees at the time they were made.

advanced legal fees, did not advise Santiago to seek independent counsel, and was still representing Santiago as his attorney.

Finally and most importantly, Evans violated Rule 4-1.8(a) by entering into the agreement for the purchase of the Vessel from Santiago without advising Santiago in writing of the reduction in debt allegedly owed and without advising Santiago of the desirability of seeking independent counsel and providing Santiago reasonable opportunity to seek such counsel.[23] Additionally, there is no evidence of Santiago providing informed consent, in writing, to the essential terms of the transaction including Evans' role in the transaction.   At trial, Evans

---

[23] Rule 4-1.8(a) of the Rules Regulating The Florida Bar states:

> **Business Transactions With or Acquiring Interest Adverse to Client.**  A lawyer shall not enter into a business transaction with a client or knowingly acquire an ownership, possessory, security, or other pecuniary interest adverse to a client, except a lien granted by law to secure a lawyer's fee or expenses, unless:
>> (1) the transaction and terms on which the lawyer acquires the interest are fair and reasonable to the client and are fully disclosed and transmitted in writing to the client in a manner that can be reasonably understood by the client;
>> (2) the client is advised in writing of the desirability of seeking and is given a reasonable opportunity to seek the advice of independent legal counsel on the transaction; and
>> (3) the client gives informed consent, in a writing signed by the client, to the essential terms of the transaction and the lawyer's role in the transaction, including whether the lawyer is representing the client in the transaction.

R. 4-1.8(a) of R. Regulating Fla. Bar.

admitted that he did not provide the terms for the reduction in Santiago's debt in a writing before Santiago entered into the agreement to sell the Vessel and did not advise Santiago to seek independent counsel.

At trial, Evans insisted that he entered into the agreement to purchase the Vessel as Santiago's friend and not as his attorney; however, this testimony is incredible. Evans' own exhibits show that Evans held himself out as representing Santiago in relation to the sale of the Vessel. As previously noted, leading up to the sale in June 2009, Santiago executed a power of attorney granting Evans the power to obtain a duplicate boat title for the Vessel. Pl. Ex. No. 6; Def. Ex. No. 13. Moreover, despite his claim that he was not acting as Santiago's attorney, Evans testified this power of attorney was to prepare the Vessel for transfer. Then, on July 6, 2009, Evans, representing himself as Santiago's counsel, wrote to the United State Coast Guard to request that the United States Coast Guard delete Santiago's vessel documentation from its DOS system. Def. Ex. No. 13. The Court finds that Evans was Santiago's attorney at the time of the Vessel sale based on the evidence presented and the fact that Evans even testified that he represented Santiago off-and-on from 2007 to 2011.

The effects of Evans' failure to comply with Rule 4-1.8(a) is one of the precise reasons the Rule exists. The Comment to Rule 4-1.8 elaborates,

> A lawyer's legal skill and training, together with the relationship of trust and confidence between lawyer and client, create the possibility of overreaching when the lawyer participates in a business, property, or financial transaction with a client. The requirements of subdivision (a) must be met even when the transaction is not closely related to the subject matter of the representation.[24]

---

[24] By violating the above mentioned provisions of the Rules Regulating The Florida Bar, Evans also violated Rule 4-1.16(a)(1) ("Except as stated in subdivision (c), a lawyer shall not represent a client or, where representation has commenced, shall withdraw from the representation of a

Therefore, based on Evans' violation of Rule 4-1.8(a), the Court finds the transaction for sale of the Vessel between Santiago and Evans to be void as against public policy.

Evans attempts to argue that the Rules Regulating The Florida Bar ("Rules") cannot be used as a basis to void the contract.  For support, Evans relies heavily on *Lee v. Florida Department of Insurance & Treasurer*, 586 So. 2d 1185 (Fla. 1st DCA 1991).[25]  In *Lee*, the court, relying on the preamble to the Rules, held that a Rule may not be used to invalidate or render void a provision in a private contract between two parties because it was beyond the scope and purpose of the Rules.  *Id.* at 1188.[26]  However, *Lee* is distinguishable on its facts.  In *Lee*, the National Council on Compensation Insurance ("NCCI") entered into a settlement agreement with Lee under which the NCCI's attorney and his firm would not represent the Florida Department of Insurance in a future administrative action involving Lee nor participate in the future administrative proceeding involving Lee.  *Id.*  at 1187.  In a later administrative proceeding, a former associate of the law firm, who worked on the prior case,  represented the Florida Department of Insurance.  When Lee challenged the representation, the Florida Department of Insurance argued that the Rule

---

client if: (1) the representation will result in violation of the Rules of Professional Conduct or law") and Rule 4-8.4 ("A lawyer shall not: (a) violate or attempt to violate the Rules of Professional Conduct, knowingly assist or induce another to do so, or do so through the acts of another").

[25] Although Evans argued specific cases in earlier filings in this case, Evans failed to raise specific case law at trial.  Beyond arguing *Lee* previously, Evans has also relied on other cases that are not applicable because they involve disputes between lawyers or between lawyers and third parties regarding fees and representation.

[26] The Preamble to the Rules states that a "[v]iolation of a rule should not give rise to a cause of action nor should it create any presumption that a legal duty has been breached. . . . Accordingly, nothing in the rules should be deemed to augment any substantive legal duty of lawyers or the extra-disciplinary consequences of violating such duty." *See Lee*, 586 So. 2d at 1188 (citation omitted).  *But see State Contracting & Engineering Corp. v. Condotte Am., Inc.*, No. 97-7014-CV, 2004 WL 5500705, at *23 n.18 (S.D. Fla. Oct. 26, 2004) ("The Preamble's limitation on the Bar Rules, thus, would seem to apply more to fee disputes between lawyers or to fee awards in favor of prevailing parties." (citation omitted)).

regarding limitation on future representation caused the settlement agreement to be void. *Id.* at 1187-88 (citing Rule 4-5.6 of the Rules of Professional Conduct).

In contrast to *Lee*, this case does not involve a private contract between two parties unrelated to the relevant Rule at issue. Instead, the contract at issue in the present case is an agreement between a client and his lawyer regarding payment for services rendered and loans made between the lawyer and the client. The Rule 4-1.8(a) specifically address this scenario and the purpose of that Rule is satisfied by its enforcement at bar. *See The Florida Bar v. Nesmith*, 642 So. 2d 1357, 1359 (Fla. 1994) (per curiam) ("We note that the obvious purpose of the writing requirement in rule 4-1.8 is to avoid a conflict of interest wherein a client is inadequately apprised of the nature and terms of a business transaction with his or her lawyer.").

The Court finds the present factual scenario is more akin to a contingency fee agreement. In fact, the Florida Supreme Court has held that a contingency fee agreement in violation of the Rules is against public policy and thus is not enforceable. *See Chandris, S.A. v. Yanakakis*, 668 So. 2d 180, 185-86 (Fla. 1995); *see also Guy Bennett Rubin, P.A. v. Guettler*, 73 So. 3d 809, 814 (Fla. 4th DCA 2011) (finding representation agreement unenforceable as a matter of law due to a violation of the Rules Regulating The Florida Bar when the contingency fee agreement provided for the immediate payment of accrued hourly rates upon discharge); *Morrison v. West*, 30 So. 3d 561, 565 (Fla. 4th DCA 2010) (voiding ab initio a contract between a client and her attorney when the attorney was not licensed to practice in Florida); R. Regulating Fla. Bar 4-1.5(d) ("Enforceability of Fee Contracts. Contracts or agreements for attorney's fees between attorney and client will ordinarily be enforceable according to the terms of such contracts or agreements, unless found to be illegal, obtained through advertising or solicitation not in compliance with the Rules Regulating The Florida Bar, prohibited by this rule, or clearly excessive as defined by this

rule."). *But see State Contracting & Engineering Corp. v. Condotte Am., Inc.*, No. 97-7014-CV, 2004 WL 5500705, at *22-*26 (S.D. Fla. Oct. 26, 2004) (finding that violation of Rules Regulating The Florida Bar did not void a contingency fee contract when the rule violation was technical and immaterial, rather than substantial and material, to the enforcement of the fee contract as a whole).

In the present case, Evans' violation of Rule 4-1.8(a) is not technical or immaterial to the Bill of Sale, and his violation goes to the very purpose of Rule 4-1.8(a).  Moreover, disregarding the rule would inure to the benefit of Evans, Santiago's attorney at that time.  Thus, Evans' violation of Rule 4.1-8(a) voids the contract.  *See The Florida Bar v. Doherty*, 94 So. 3d 443, 448 (Fla. 2012) (per curiam); *see also The Florida Bar v. Kramer*, 593 So. 2d 1040, 1040, 1041 (Fla. 1992) (per curiam) (holding that attorney violated Rule 4-1.8(a) when the attorney loaned money to the client and secured the loan by a deed to the client's property without disclosing the actual nature of the transaction to the client and when the lawyer had several business dealings in the past with the client in which he never enforced the agreements).[27]

The Court finds that the agreement between Evans and Santiago is void, rather than voidable, because if the Court found the agreement to be merely voidable, it would be recognizing the validity of a contract entered into by an attorney in clear violation of the Rules.  To allow the enforcement of the Bill of Sale would mean affording viability to a contract of the very kind that The Florida Supreme Court has determined to be in the public interest to regulate.  *Cf. Chandris, S.A.*, 668 So. 2d at 185 (citation omitted).

Because the Court finds that the agreement between Evans and Santiago is void against public policy, Evans could not transfer good title to HH & DD.  *See Am. Standard Credit, Inc. v.*

---

[27] The facts of *Kramer* seem to be eerily similar to the present case with respect to the dealings between the attorney and his client.

*Nat'l Cement Co.*, 643 F.2d 248, 268 (5th Cir. Apr. 1981) ("Essentially, [Rule 2-403 of the UCC][28] provides that sale to a good faith purchaser for value cures the defects in the seller's 'voidable' title; it cannot, however, cure 'void' title.  The distinction between 'void' and 'voidable' title, therefore, is crucial.").[29]   Therefore, the Court will award possession of the Vessel to Santiago.

## V.      FRAUD ON THE COURT

During the trial, the Claimants raised the argument that Santiago committed a fraud on the Court and thus argued that the Court, pursuant to its inherent power, should strike Santiago's pleadings and dismiss this case.   *See Chambers v. NASCO, Inc.*, 501 U.S. 32, 50 (1991) ("[W]hen there is bad-faith conduct in the course of litigation that could be adequately sanctioned under the Rules, the court ordinarily should rely on the Rules rather than the inherent power.  But if in the informed discretion of the court, neither the statute nor the Rules are up to the task, the court may safely rely on its inherent power.").

Specifically, Claimants argue that Santiago failed to disclose in his certificate of interested parties (Doc. No. 14) various individuals and entities that allegedly had an interest in the litigation, including the original custodian and the entity to which Santiago intended to sell the Vessel.  However, the thrust of the Claimants' allegations focus on Brian Soleil or Brian Salle[30] and David Salle, not on Santiago.   Additionally, the Claimants failed to produce Brian Soleil/Brian Salle and David Salle as witnesses and relied heavily on objected-to-hearsay and a

---

[28] The Florida version of this rule is found at Section 672.403, *Florida Statutes*.

[29]*See Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc) (adopting as binding precedent all decisions of the former Fifth Circuit prior to the close of business on September 20, 1981).

[30] Claimants allege that Brian Salle is an alias that Brian Soleil uses.

document dump of various email chains that were objected to as unauthenticated.  *See* Def. Ex. No. 14.[31]

A finding of fraud on the court "should . . . embrace only that species of fraud which does or attempts to, defile the court itself, or is a fraud perpetrated by officers of the court so that the judicial machinery cannot perform in the usual manner its impartial task of adjudging cases that are presented for adjudication." *Travelers Indem. Co. v. Gore*, 761 F.2d 1549, 1551 (11th Cir. 1985) (per curiam) (quoting 7 <u>Moore's Federal Practice</u> ¶ 60.33); *see also Rozier v. Ford Motor Co.*, 573 F.2d 1332, 1338 (5th Cir. 1978) ("Generally speaking, only the most egregious misconduct, such as bribery of a judge or members of a jury, or the fabrication of evidence by a party in which an attorney is implicated, will constitute a fraud on the court.  Less egregious misconduct, such as nondisclosure to the court of facts allegedly pertinent to the matter before it, will not ordinarily rise to the level of fraud on the court." (citations omitted)).  With respect to perjury, the Eleventh Circuit has held that perjury alone does not constitute fraud upon the court. *Gore*, 761 F.2d at 1552 ("Fraud on the court is therefore limited to the more egregious forms of subversion of the legal process, . . . those we cannot necessarily expect to be exposed by the normal adversary process." (quoting *Great Coastal Express v. Bhd. of Teamsters*, 675 F.2d 1349, 1357 (4th Cir. 1982))); *SEC v. ESM Grp., Inc.*, 835 F.2d 270, 273 (11th Cir. 1988).[32] Additionally, fraud between the parties is not fraud on the court. *Idearc Media Corp. v. Kimsey & Assocs., P.A.*, No. 8:07-cv-1024-T-17EAJ, 2009 WL 928556, at *3 (M.D. Fla. Mar. 31, 2009) (citing *Patterson v. Lew*, 265 F. App'x 767, 769 (11th Cir. 2008)).

---

[31] Claimants did not provide any additional evidence regarding the reasonableness of custodial charges; therefore, the Court will not address this issue.

[32] During the trial, both parties provided inconsistent statements and took much liberty with the truth.

To prove fraud on the court, Claimants must by clear and convincing evidence show that Santiago "has sentiently set in motion some unconscionable scheme calculated to interfere with the judicial system's ability impartially to adjudicate a matter by improperly influencing the trier of fact or unfairly hampering the presentation of the opposing party's claim or defense." *See Rozier*, 573 F.2d at 1339 (citation omitted); *Bryant v. Troutman*, No. 3:05-cv-162-J-20MCR, 2006 WL 1640484, at *1 (M.D. Fla. June 8, 2006) (citations omitted).   The Court finds that the alleged fraud on the court did not impair this Court's ability to adjudicate this matter impartially. As well, the Court finds that the alleged fraud did not unfairly hamper the Claimants' presentation of their defense.

## VI.   HH & DD'S CLAIM FOR IMPROVEMENTS

HH & DD is seeking compensation for improvements it made to the Vessel during its alleged ownership.  Kelley testified on behalf of HH & DD that HH & DD expended roughly $20,000 in labor and material[33] on improvements ranging from the air conditioning system and vacuum system to the various filters.   However, Kelley failed to provide any sort of documentation or invoices for these improvements beyond his broad testimony. Therefore, the Court finds that HH & DD failed to offer sufficient evidence to support its claim for improvements.

## VII.   CONCLUSION

The Court's Odyssean journey has come to an end.  Thus, the Court concludes that Santiago is the rightful owner of the Vessel.  Based on the foregoing, it is **ORDERED** as follows:

1. By November 30, 2012, the parties shall file any motions for attorney's fees, if applicable.

---

[33] Kelley vaguely testified that he thought HH & DD probably expended $5,000 to $8,000 on materials and the balance on labor.

2. By November 30, 2012, Santiago shall file any motion necessary to complete the

transfer of the Vessel back to Santiago.

**DONE** and **ORDERED** in Orlando, Florida on November 27, 2012.


ANNE C. CONWAY
United States District Judge




Copies furnished to:
Counsel of Record
Unrepresented Parties